ALLEN *vs.* THE PUBLIC ADMINISTRATOR.

*In the matter of proving the last Will and Testament of* JOHN HARRISON, *deceased.*

A WILL admitted to probate,—contested on the ground of incapacity, undue influence and fraud.

If the general competency of the decedent be not questioned, the burden of proving that at the particular time when the will was executed, he labored under any delusion, aberration or weakness of mind, rests with the contestant.

Whether such weakened capacity existed at the time, and whether the will was made and procured by the artifice, influence or control of others, is the subject of affirmative proof and not of surmise and suspicion.

In determining whether a will has been procured to be made by undue influence, it is proper to see if the testamentary provisions are in harmony with the decedent's dispositions and affections. Subsequent recognitions of the will by the decedent, when in health, and in the undoubted full possession of his faculties, are material facts in its favor.

> ALBERT MATHEWS, *for the Executors.*
> J. S. THAYER, *the Public Administrator in person, and by* EDWARD SANDFORD.

THE SURROGATE. The decedent at the time of his death was unmarried, had no descendants, and left surviving his father, William Harrison, his heir and next of kin. There is no definite proof that he knew of the existence of any other near relations, if he had any such. The decease of

his wife had dissolved the ties of affinity, which in her lifetime, connected him with her children.

William Harrison, the father, died on the 18th of March, 1850, ten days after the death of his son, and the Public Administrator, having taken out letters of administration on his estate, was admitted to contest the will of the decedent.

The will propounded for probate, appropriates the income of the estate, so far as may be necessary, towards the support and maintenance of William Harrison, the father, for life, and after his death, directs the payment of a legacy of $700, to Sarah Ann Lovejoy; a legacy of $300, to Phebe Peterson; and a legacy of $2,500, to Theodore Allen; the residue, if any, being given to Thomas E. Allen, who is named executor.

During the progress of this case, and amid all the variety of testimony accumulated on different points, not a particle of proof has been adduced, suggesting a doubt as to the genuineness of the signature of John Harrison, subscribed at the end of the will. The attestation clause is full in its recital of all the statutory ceremonies, and is subscribed by two witnesses, Richard M. Harrington and Edward Beadle. There is nothing informal on the face of the paper. Mr. Harrington, one of the witnesses, testifies that he saw the decedent sign the will, heard him declare it to be his last will and testament, was requested by him to sign as a witness, and did so. He also proves the subscription and publication of the will in the presence of Beadle, the request of the decedent to Beadle to become a witness, and his compliance therewith. The same facts are substantially proved by Beadle himself.

An effort was made to impeach Mr. Harrington, and for this purpose, the contestant, in the first instance, called eleven witnesses, all of whom testified that his general character was bad, and six of them stating they would not believe him under oath. On the other side, thirty-five witnesses were examined, who spoke favorably of his char-

acter, the majority expressing a positive opinion that it was good; some stating that they had never heard it questioned, and all, with an exception or two where the question was not put, saying they would believe him under oath. Another witness having been called, I stopped the testimony in support of his character and credibility. The contestant then called three more witnesses, who testified that his charac- ter was bad, and they would not believe him under oath. Here the effort to impeach him ceased. It is obvious that the numbers are strongly in favor of the witness. On his side I limited the testimony; on the other I did not; and yet the numbers stand 35 to 14. True it is, that in a certain sense *testes ponderantur, non numerantur;* but on weighing the witnesses and considering their respectability and means of knowledge, I find gentlemen of standing and character on both sides. In *Bakeman* vs. *Rose*, 14 *Wend.*, 109, the Judge had charged the jury, that "if an equal number of witnesses of equal respectability and means of knowledge, be produced to sustain his reputation, the character of the witness will stand as if no impeachment had been made or attempted." Neither the Supreme Court, nor the Court for the Correction of Errors (18 *Wend.*, 146), found any error in this doctrine. The support of Mr. Harrington's general character and reputation, has not been confined to the limits of this rule, but while the attempt to impeach him was exhausted on the examination of 14 unfavorable witnesses, the defence, after 35 were heard in his favor, was only terminated by the interposition of the Court. It is obviously, in my judgment, a plain case of an unsuccessful effort at impeachment.

There are some discrepancies in the evidence in this case, which are not, however, very important; and in stating the conclusions at which I have arrived, I prefer to dwell upon such broad and prominent features of fact as are sustained by the general weight of testimony, and which, in my judgment, should control the decision of the Court.

The contestant has questioned the testamentary capacity of the deceased, and urged, that the will was procured by means of undue influence, at a time when his mental power was in a weak or impaired state. In the consideration of this point, it is necessary to take into view the character and habits of the decedent, which form, in a measure, the standard of criticism in judging of his actions. It appears that he was the proprietor of a gaming house in this city, indulged frequently in excessive drinking, and led an irregular life. It was natural he should, with such dispositions, resort to places not of good repute, and should have some associates of corresponding tastes and pursuits. At the same time, he seems to have retained some degree of pride and a desire to preserve appearances. He was undoubtedly possessed of a fair degree of intelligence, force and energy of mind. I do not understand his general competency to be questioned; and it follows, therefore, that the *onus* of proving, that at the particular time when this will was executed, he labored under any delusion, aberration or weakness of mind, rests with the contestant. (2 *Curteis*, 415.) The evidence adduced to impeach Mr. Harrison's capacity at the time the will was executed, was chiefly inferential, consisting mainly of facts, indicating that at previous periods he had been subject to attacks of delirium, from which the deduction was sought to be made, that at the particular time in question, he was in a similar condition. Mrs. McMahon, the daughter of the decedent's wife, testified, that since she returned from school, in 1846, he had, with one exception, been in the habit of getting into a drunken debauch "about every six weeks," that it would generally take about a week before he reached the height of his intoxication; he would remain in that condition, confined to his bed, about a week, and he would be about a week recovering; that during the period he was confined to his bed, his mind was more or less deranged, and under delusions, and he said and did many things, of which on recovery he was entirely unconscious. At these

times, the witness stated, " he would never see any person, except Simon, the waiter, Mr. Hearn, and Mr. Solomon Kipp, his most intimate friend ;" that " he had a physician about every other attack," Dr. Lyon, who " was called when he was in his worst state ;" and that the summer previous to her mother's death (1848), she thought " he was worse than he ever had been." Mr. Kipp, one of the persons admitted to see the decedent on these occasions, testifies that he had been to see him " very few times," when he was sick; he had been there " when he was unwell," but " not very ill," and he " never at any time saw him when he was in any wise delirious." Dr. Lyon states, that he attended in the family frequently, but he mentions only a single occasion, as he thinks, in 1847, when he attended the decedent personally.* At this time, he was sick in consequence of excessive drinking, and had the *delirium tremens.* Dr. Ford, who visited the decedent in his last illness thinks, that on that occasion, his mind at times was wandering. This is all the proof bearing upon the question, and in connection with the habits of the decedent, and the cause of his sickness while at the place where the will was made, it renders it very proper to inquire, whether at that time his attack was accompanied with delirium, mental delusion, or derangement. With the means directly of ascertaining that point, of course merely argumentative or inferential proof, must yield to direct evidence. Conjecture, inference or probability, as to what might have been his mental condition at the time, must of necessity be overcome by proof of what it was in fact. In analyzing the testimony relating to this branch of the case, it is worthy of observation, that Mrs. McMahon, upon whom rests the proof of the usual appearance of delirium, after the deceased had become sick by excess in drinking, visited him at Lovejoy's, on the 16th of March, 1849, two days after the

* In a note written to me after his examination, the Doctor, on consulting his books, fixed the date from the 2d to the 6th March, 1848, inclusive.

date of the will, and remained in conversation with him about two hours. At that time, she requested him to sign a power of attorney, and though she found him " exceedingly feeble" and nervous, she does not appear to have noticed any indications of mental derangement, such as she had observed on previous cases of sickness. Mr. Solomon Kipp and Mr. Hamer, also visited the decedent several times at Lovejoy's, and observed nothing different from his ordinary state of mind ; but I put little stress on this fact, as when Mr. Kipp saw him he was convalescing, and the precise periods of Mr. Hamer's visits did not definitely appear. By far the most satisfactory information is afforded by Dr. Geer, his physician. He had known Harrison for many years. He attributes his attack to excess in drinking, states that he found him very ill, and that he was " generally prostrate, laboring under great nervous excitability, and too feeble to move about." The Doctor expresses an opinion, and states a fact, as to his mental condition. The opinion is this : "I should suppose that the nervous excitement under which he was laboring, occasioned by the reflection of bile upon the nervous system, would not in any way dement him, but might unman him to a degree, that would make him the subject to be acted upon, in a way to his own disadvantage, by designing persons."

The fact he gives is, "I did not see at any time that he was demented in any way, or that he could not properly answer any interrogatory I put to him. I observed nothing in his mental capacity different from what I had been accustomed to see in him, except that he was feeble in body, and nervous." He also adds that he does not know " whether he was ever the subject of an attack of *delirium tremens*." It is perfectly clear, therefore, to my mind, that on the occasion of this illness, the deceased was not the subject of an attack of *delirium tremens*, or otherwise under delusion or derangement of mind. Whether at the time the will was made, he was so reduced in strength of body and mind as to expose him to the artifices or the con-

trol of stronger minds,—whether this will was in fact made at a period of such debility, and under the operation of such influences, are proper subjects of affirmative proof, not of surmise and suspicion. Doctor Geer says that for several days he was alarmed for the result, in consequence of the excessive vomiting, and prescribed for him very actively, probably administering the four prescriptions referred to by Du Puy, the druggist, in the first three days. "There was a change for the better before the fifth or sixth day;" "he was improved very much, the vomiting had ceased, he could retain food, he was more composed and tranquil." The Doctor repeats this in another form; "the reflection of the bile upon the nervous system continued for about five or six days." "I do not remember how soon he first changed, but I remember it was within five or six days after the treatment commenced." "I ceased to visit him twice a day, I think, about five or six days after my first visit." How much this improvement was "within five or six days," may be made more clearly to appear by reference to the prescriptions. The druggist specifies four prescriptions, numbered 9679, 9680, 9686, and 9693, which Dr. Geer identifies as prescribed for Harrison. The first two were manifestly made up at or about the same time, the third is only the sixth after the second, and the fourth, only the seventh after the third. The prescriptions are numbered at the druggist's when made up, and those given for Harrison evidently followed in rapid succession. No. 9653, on the druggist's books, was dated March 7; 9684, March 11; 9710, March, 14; and 9711, March 15th. There can be little doubt on a comparison of these dates, that the last prescription for Harrison was made up about the 12th of March. The last prescription, 9693, consisted of creosote and opium, which Dr. Geer says he administered to arrest vomiting, but did not resort to it at first; and he states that the first symptom of improvement was a greater power of retaining fluids upon the stomach. Now Harrison was sick some days before a

physician was called in. Mrs. McMahon says on the 14th of March he had been absent from home ten or twelve days, which would put the beginning of his sickness at the 2d or 4th of March, and she thinks Dr. Geer called at Houston Street to see him about a week before the 16th of March, which would place his first visit about the 9th. Of course there is no precision as to these periods; but bearing in mind that the improvement spoken of by Dr. Geer when he ceased visiting twice a day, occurred "before the fifth or sixth day," that the creosote, the last prescription made up at Du Puy's, and the medicine upon which great reliance was placed to arrest the vomiting, was probably administered on the 12th of March, I am inclined to think the testimony preponderates in favor of the idea, that on the 14th, the day the will was made, the decided improvement spoken of by Dr. Geer had taken place. Certain it is, that neither of the subscribing witnesses to the will speak of the vomiting, the most alarming symptom, on the suppression of which convalescence ensued. Those witnesses also affirm positively a sensible and rational state of mind at the time, and I think their evidence on that point entirely in harmony with all the other facts. With this view of the mental condition of the decedent, it is hardly necessary to consider the circumstances offered to show that the will was procured by undue influence. But it may be more satisfactory to review the facts material to that point of the case.

1. The place in which the will was made might, under ordinary circumstances, excite suspicion. It is, however, manifest that the decedent was in the habit of resorting to Lovejoy's, and on occasions when he was indulging in drinking, Mrs. McMahon says, "He never went at such times while we were in Houston Street, to any other place than to Lovejoy's." That house was near his own home, he was taken ill there, and being seriously sick, it was very natural for him to make his will there.

2. His family being kept in ignorance of his condition,

and being denied admission, would ordinarily occasion surprise, but it appears from Mrs. McMahon's evidence, that this grew out of his own wishes, for when she insisted upon entering the room where he lay, he said to Mrs. Lovejoy, " For God's sake tell her I am not here, for I should prefer all persons to see me except her ;" Mrs. McMahon adds, " I expressed my surprise at first, at his not informing me where he was, knowing the anxiety I would feel. He replied that he was ashamed to see me, his conduct had been such, and asked me why I sought to know where he was, knowing his feelings not to be seen at such times."

3. Whether the terms of the will are consistent with the state of the affections of the decedent at the time, is not so easy of solution. The provisions for his father,—an infirm old man,—for Mrs. Lovejoy and Mrs. Peterson, are natural, and indicate, in the one case, filial solicitude, and in the others, a proper recollection of one who had attended his wife in her last sickness, as well as of the person who was then performing similar services for himself. That, as Mrs. McMahon relates, he thought Mrs. Peterson an unfit associate for his wife, is not inconsistent with a sense of her kind attentions, and a desire to reward them. The motives which operated on his mind in favor of Theodore Allen, are not so apparent, though it is obvious that at the time he was on terms of intimacy with the Father. Allen was requested by Harrison to send Mr. Harrington to draw his will. It is not improbable that a feeling of pride induced him not to call in his own counsel. Dr. Geer saw Allen at Lovejoy's ; Harrison, at the time of drawing the will, called him in a familiar way, " Old Allen ;" it was through Allen the information reached Mrs. McMahon that Harrison was at Lovejoy's, and that lady states that " Allen was in the habit of coming almost daily to their house ;" and a few days after, when Harrison had returned to his dwelling in Houston street, she says, " Mr. Allen used to come there frequently, morning and evening, and during the day." But it must not be forgotten, that the

decedent was without near kin, except his father. With no relatives with whom he was in the habit of associating, or in whom he took an interest, after providing for the comfort of his sole surviving parent, and two persons who had claims upon his bounty, the residue was to be disposed of in some way, and under the circumstances probably among strangers to his blood. Nor does it appear at this moment, who of kin to William or John Harrison would take this estate, were the latter declared to have died intestate. The degree of intimacy which subsisted between him and Mr. Allen is quite sufficient, then, to justify the provisions of the will in his and his son's favor, so far as the family relatives of the deceased are concerned. In this particular, natural affection has not been violated. I see nothing unusual or extraordinary, nothing even to arouse suspicion in this will, and, in fine, nothing inconsistent with the known state of the decedent's dispositions and feelings, provided at the time, his affections were in process of alienation from Mrs. McMahon. There is no doubt that at a previous period he had been strongly attached to this lady, and had he then made such a will as this, it would have been singular. Not long after the will was executed, the parties were on terms of open hostility. There was an intermediate period of transition. Ordinarily such changes are not violent or sudden, but on the contrary, so gradual in their progress, that the inception and subsequent stages are far from being marked. On the 11th of May, 1849, about two months after the date of the will, Mrs. McMahon, in conjunction with her husband, instituted proceedings before me for the purpose of having Mr. Harrison removed as executor of the estate of his deceased wife. As she states the object of that proceeding, it was "to establish that Mr. Harrison was a gambler and a drunkard, and for these reasons, to have him removed as executor." Upon this followed a litigation, evidently of the most painful character to the decedent, and which was still pending at the time of his death. Previous to this, a

note dated March 8th, 1849, the very time Harrison was sick at Lovejoy's, given by Mr. McMahon for interest due on a loan upon some diamonds partly claimed by his wife, had fallen due on the 11th of April. Harrison's refusal to take up this note was, according to Mrs. McMahon's understanding, the occasion of the first breach between them. But before this, and at the time of taking the inventory of the estate of her mother, Mrs. McMahon had claimed as her own property, a harp and piano, and several other articles, and that claim was entered upon the inventory. The appraisers, one of whom was Mr. Allen, were qualified February 14, 1849, and they appear to have made the appraisement on the 16th of February, though it was not sworn to by Harrison, the executor, till the 26th of March. The claim thus made was never submitted to by Harrison, and though at one time he verbally agreed to refer the dispute, yet on taking counsel, he finally, about the 4th of April, refused to refer it. Looking at the differences in regard to the diamonds, the harp and piano, and Harrison's refusal on the 16th of March to execute the power handed to him by Mrs. McMahon, and which she says he had several times promised to sign, doubts very naturally arise as to the degree of confidence and good feeling then existing between them. These doubts are increased on adverting to the declarations of Harrison made to third parties. Mr. Harrington says, when the will was drawn the decedent spoke of Mrs. McMahon, gave a reason for not mentioning her in his will, and spoke as if he were not friendly to her and her husband. Mr. Hamer, who visited him at Lovejoy's, says he told him when he was sick there, that he had been treated badly by Mr. McMahon and his wife. Mary Bleakley states that Harrison, in the summer of 1849, said they had not treated him well while he was on Blackwell's Island. Mr. Chapman, a keeper at Blackwell's Island when the decedent was confined there, states that at first he spoke in high terms of Mr. McMahon and his wife, but subsequently

used different language, in effect that "Mr. McMahon was trying to injure him by getting him removed from the executorship of the estate of his wife, by taking the control out of his hands." The same witness shows that at this period Harrison continued to speak of Mrs. McMahon in terms of strong regard and affection. Mr. Britton testifies that when he was in New-York the last of March, 1849, Harrison told him he was "losing confidence" in Mr. McMahon; "he had tried to deceive him, and he was finding him out, or had found him out;" "he had drawn a power of attorney to give him charge of the settlement of Mrs. Harrison's estate, and read it to him in the usual way, as though it were revocable, and wanted him to sign it in a hurry. He refused to do so, and took it for examination, and found it was made irrevocable;" that he thought Mrs. McMahon "was under the control of her husband," and he "thought Mr. McMahon was managing to get the control of the property of the estate, and that he should not allow him to do so if he could help it." The same witness testifies that he had a conversation with Harrison in the latter part of February, 1849, respecting Mr. and Mrs. McMahon. "He complained that Mrs. McMahon was claiming too much of the property in the house, more than belonged to her. There were several things she claimed, her title to which he doubted by the will. He did not think she was entitled to the harp and piano; he should not let her have them unless she could substantiate her claim. He said also that some things in the house had disappeared, and he did not know where they were. He also remarked that he had thought more of Lucy Ann; as much as of any person on earth. He thought from the course she and Mr. McMahon was taking, he was rather losing confidence in them;" that "he had always intended making Lucy Ann his sole heir of his property; her conduct was such that she did not seem to have as much affection for him as she formerly had, and he rather doubted whether he should pursue that course."

The witness also says, "The first time I saw Mr. Harrison after he was out of prison, he spoke rather hesitatingly about giving the power. I talked to him as though I expected it. I don't know that he denied it, or admitted it. In March he told me positively he would not. I think I saw the power in McMahon's house. The second time I was down in February, he told me McMahon had read it to him wrong, and he did not think he would give him the power. The giving the power was family talk from the time Mr. Harrison died, till February." What ground the deceased had for these suspicions and feelings is not for me to say; the only thing material about them is their existence. It is beyond contradiction, that the decedent entertained a very strong affection for Mrs. McMahon; she and her husband acted in the most kindly manner in the effort they made to procure his pardon, which was accomplished. Mr. McMahon was instrumental in having the objections made against the grant of letters to Harrison on his wife's estate withdrawn; and these circumstances, in connection with all the interviews and conversations between the parties to the time of the sale of the furniture, satisfy my mind, that up to that period the relations of the parties were *externally* kind and friendly. But I cannot come to the conclusion that when the will was made, the real state of the decedent's affections towards Mrs. McMahon was such as to afford a strong presumption that a will, which did not provide for her, was made under undue influence. The delay in executing the power, and completing the inventory, with other facts I have adverted to, indicate that suspicions and doubts had taken root in his mind, which, though not shown ostensibly in his intercourse with the parties, and whether well or ill-founded, afford the only just criterion in judging of the conformity of the will to his existing dispositions. It is of necessity difficult to penetrate beneath the surface and look into the heart; but with the best light afforded by the testimony, I am constrained to think it probable that his confidence had been

shaken, and his affection impaired, so that it is not at all improbable that the will was in harmony with his real feelings at the time in question.

4. But if it were otherwise, and if the will was really procured to be made by undue influence, when his mind was in a weak and nervous condition, why was it not revoked on his recovery? Ten days after it was executed, he was able to leave the house, and to visit Mr. McMahon at his office. There is no intimation that he was not then and subsequently in the full possession of his faculties, and it is impossible to suppose he had forgotten the fact of the execution of the will. And yet, Mrs. McMahon states, he expressed in very decided terms, his intention to leave his property to her. It is true that Mr. Britton, in whose presence one of those conversations is stated to have occurred, contradicts her in that respect; but without looking at that, and simply contrasting these declarations with his previous and subsequent statements to others, and bearing in mind that no open rupture had yet occurred, the decedent's conduct, though exposed to the charge of disingenuousness, is not unsusceptible of explanation. For after Mr. McMahon and his wife had instituted proceedings for his removal, as executor of his wife's estate, on grounds which assailed his character, and could hardly fail to incense him, he made declarations distinctly recognizing this will. In the fall of 1849, he was again taken sick, and Dr. Warington, who attended him, states he told him that he had made a will, " his father was provided for;" " he had left something to Mrs. Lovejoy;" " that she had been very kind to him." " He had made it when he was ill under Dr. Geer," and as the witness understood him, at " Lovejoy's house." Mr. Granger, who saw him subsequent to this illness, as he fixes the time, says that Harrison told him he had been very sick, and he "might judge how far he was gone, that he had sent for his lawyer, or 'for a lawyer, and had his will made." In the succeeding December, he stated to Mr. Britton, in relation to Mrs. McMahon, and her

treatment of him, " that he had loved her, his whole soul had been wrapped up in her ; he had always intended to give her all the property he might have, but had made up his mind he should never give her a cent;" and again in the following February, he said to the same witness, " he had made a will and had not given her any thing." In the same month, he stated to Mr. Chapman, that he had made his will, to prevent Mr. McMahon getting any benefit from his property, and that the proceedings then pending would be carried on by his executor,—probably having some loose notion that, on his decease, his executor would succeed to the executorship of the other estate. Thus to four persons, Warington, Granger, Britton and Chapman, the decedent declared, that he had made a will ; to one of them speci-fying provisions similar to those contained in the will now propounded, and to two of them, stating its contents as un-favorable to Mr. and Mrs. McMahon. I know, very well, how much conversations of this kind are to be distrusted. From motives of policy, for the sake of peace, to secure kindly attention, or from other motives often operating upon the human mind, especially in the case of an artful or wary man,—or again, in an unguarded moment, in a spirit of ex-asperation or boasting, or threatening, loose declarations are frequently made of testamentary dispositions and in-tentions, contemplated or executed, which are not in har-mony with the truth. " The loose declarations," says Sir John Nicholl (*Johnston* vs. *Johnston*, 1 *Phill.*, 447), " which a man often makes in conversation with his friends and ac-quaintance, are of very little weight indeed. They may on the part of the testator be insincere, or at best the mere passing thought of the moment, and are liable on the part of witnesses, to be misapprehended and misrepresented." For this reason, I place no particular reliance upon the de-tails presented by these witnesses,—so much depends upon the precise words used and a recollection of all that was said ; but still, looking only at the general effect and bear-ing of their evidence, there can hardly be a reasonable

doubt, that the decedent had in his mind and alluded, in however ambiguous terms, to the will now propounded for probate.

With the light we have, as to the decedent's testamentary capacity, the state of his feelings, the circumstances attending the execution of the will, the emanation of instructions from him personally, the severe litigation which ensued between him and Mr. and Mrs. McMahon, and the general tenor of his previous and subsequent declarations to third parties,—to overturn this will, in the absence of direct proof of undue influence, upon mere conjectures and suspicions, would, I think, be an unwarrantable and extreme act. My opinion is, that it should be admitted to probate as a valid will of real and personal estate.